## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DENTAL PROFILE, INC. and | ) | |
| DENTIST, P.C., | ) | Case Nos. 08-17148, 08-17149 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable Jacqueline P. Cox |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the Court for ruling on the motion of Nereida Mendez ("Mendez") for sanctions against debtors Dental Profile, Inc. ("Dental Profile") and Dentist, P.C. (collectively, the "Debtors"); Dr. Husam Aldairi ("Aldairi"), the sole owner of the Debtors; Paul M. Bach ("Bach"), former counsel for the Debtors; and Cindy M. Johnson ("Johnson"), counsel for Aldairi.[1] Pursuant to Federal Rule of Bankruptcy Procedure 9011 and section 105(a) of the Bankruptcy Code, the motion seeks reimbursement from the Debtors, Aldairi, and Bach of all attorneys' fees and costs incurred during the Debtors' bankruptcy case, as well as disgorgement of any attorneys' fees accepted by Bach and Johnson throughout the pendency of the bankruptcy proceedings.

For the reasons that follow, the Court finds that the Debtors' Chapter 11 bankruptcy petitions were filed for the improper purpose of frustrating, hindering, and delaying Mendez in

---

[1] Subsequent to the filing of the sanctions motion, Bach and his wife Penelope N. Bach withdrew as counsel for the Debtors in order to avoid a potential conflict of interest posed by the dual representation. (*See* Bankr. Case No. 08-17148, Dkt. Nos. 299, 301.)

-1-

the collection of her judgment and imposes sanctions pursuant to Bankruptcy Rule 9011 solely

against the Debtors and Aldairi in the amount of $314,536.34.

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and

Internal Operating Procedure 15(a) of the United States District Court for the Northern District of

Illinois.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(O).  *See In re Volpert*,

110 F.3d 494, 497 & n.1 (7th Cir. 1997) (finding that motions for sanctions are core proceedings

and, therefore, matters over which the bankruptcy court has the authority to hear and adjudicate);

*Troost v. Kitchin (In re Kitchin)*, 327 B.R. 337, 359 (Bankr. N.D. Ill. 2005) (same).  Venue is

proper under 28 U.S.C. § 1409.

Despite the dismissal of the underlying bankruptcy case, the Court may retain jurisdiction

to consider collateral issues, such as the imposition of sanctions.  *Kitchin*, 327 B.R. at 359; *see

also In re Carl F. Semrau D.D.S., Ltd.*, 356 B.R. 677, 689 (Bankr. N.D. Ill. 2006) (noting that

"logic compels the conclusion that the Debtors' invocation of § 105 of the Bankruptcy Code . . .

vests this Court with subject matter jurisdiction"); *In re Am. Telecom Corp.*, 319 B.R. 857, 862

(Bankr. N.D. Ill. 2004) (finding that the court "may retain jurisdiction after the dismissal of a

case for the limited purpose of adjudicating Rule 11 (or Rule 9011) litigation").

## II. FACTS AND BACKGROUND

Over the course of several months, ten days of hearings were held and dozens of exhibits

admitted in connection with the motion for sanctions currently before the Court.  During the

hearings, numerous witnesses testified, including Bach, Aldairi, the Debtors' accountant

Mohammad Abu Ghoush ("Abu Ghoush"), judgment creditor Mendez, and Mendez's attorney

Dana Kurtz ("Kurtz"). Much of the testimony, particularly Aldairi's and Abu Ghoush's, was

inconsistent and evasive, frequently confusing matters rather than clarifying them, and many of

the exhibits were incomplete, unclear, or simply missing from the exhibit books submitted to the

Court. Despite the inconsistencies and lack of clarity, the Court is able to glean the following

facts.

Aldairi, a dentist licensed to practice in the state of Illinois, is the president and sole

shareholder of debtors Dental Profile and Dentist, P.C. (*See* Bankr. Case No. 08-17148, Dkt.

Nos. 98, 278 at 34:16-24; 377 at 136:11-16.) According to United States income tax returns filed

for 2008, Aldairi also owns, in whole or in part, five other dental companies–Aya Dental Ltd.,

Hyde Park Dental Profile, Ltd., Elgin Dental Profile Ltd., AKA Dental Ltd., and Dental Profile

Michigan–all of which are headquartered at 120 East Lake Street in Addison, Illinois.[2] (*See*

Debtors' Exs. 22-26.) Through these corporations, Aldairi owns and operates various dental

clinics in the city of Chicago and its surrounding suburbs.

The testimony regarding which individual clinics Aldairi owned and when he owned

them is inconsistent and muddled. At his 2004 examination, Aldairi testified that, as of March

2007, he owned and operated clinics on Montrose Avenue, Pulaski, North Avenue, Addison

Avenue, Michigan Avenue, and Central Avenue, as well as a clinic in Elgin and another in Hyde

---

[2] In 2007, the year prior to the bankruptcy filing, Aldairi also owned, in whole or in part, two other dental corporations, North Dental Profile and Dental Profile Burbank, although those companies are not listed on his Schedule E for tax year 2008. (*See* Debtors' Ex. No. 20.)

Park.[3]  (Aldairi 2004 Exam at 8-13, 15.)  He testified that, prior to 2007, he also owned other

dental clinics, including one in Melrose Park, which he subsequently sold or relinquished

ownership of.  At trial, Aldairi testified that he closed the clinic on Michigan Avenue in about

2009 (Bankr. Case No. 08-17148, Dkt. No. 377 at 182-84), sold the clinic in Burbank to a

practicing dentist who assumed the corresponding loans (*id.* at 185-86), sold a clinic located on

Sedgwick, again to a dentist who assumed the loans (*id.* at 187), sold the Melrose Park clinic for

more than $500,000 (*id.*, Dkt. No. 336 at 95), sold the clinic on 26th Street for about $900,000

(*id.* at 109-112), and sold a clinic on North Broadway in about 2005 or 2006 (*id.* at 113:6-13).

Although Aldairi was uncertain as to when and for how much he sold each of the clinics, he

testified that he did not sell any of them after the bankruptcy filing.  (*Id.* at 115-16, 118:12-14.)

   According to the Debtors' schedules, only the Montrose Avenue and Addison Avenue

locations operate under the Dental Profile corporation, and only the North Avenue location

operates under the name Dentist, P.C.[4]  (*Id.*, Dkt. No. 17; Bankr. Case No. 08-17149, Dkt. No.

21.)  The other locations seem to operate under the names of Aldairi's other corporate entities,

---

   [3]  At trial, Aldairi testified that as of April 2007, he owned dental clinics in Elgin and
Burbank, as well as clinics on Michigan Avenue, Central Avenue, and 26th Street.  (Bankr. Case
No. 08-17148, Dkt. No. 377 at 146-48.)

   [4]  Aldairi repeatedly maintained throughout the proceedings that Abu Ghoush, the
accountant for the Debtors, knows all of the details regarding the dental businesses.  Based on his
testimony, however, Abu Ghoush also seemed unsure and confused as to the corporations under
which each dental clinic operates.  According to his 2004 examination testimony, Abu Ghoush,
stated that the North Avenue and Montrose Avenue locations operate under a corporation called
Perla Dental and that the Addison location alone operates under the Dental Profile name.  (Abu
Ghoush 2004 Exam at 12.)  Subsequently, during his testimony at trial, he stated that every clinic
was owned by Dental Profile and that the Montrose and North Broadway locations were owned by
Dentist, P.C.  (*See* Bankr. Case No. 08-17148, Dkt. No. 337 at 179:17-25.)  Immediately thereafter,
however, he went on to testify that many of the clinics were owned by the other dental corporations.
(*See id.* at 180-81.)

although he testified that all but the Michigan Avenue location bear the Dental Profile name on

their exteriors. (Aldairi 2004 Exam at 58-59.) Aldairi owns the property on which some of his

dental clinics operate; for the clinics on other properties, he pays rent. (*See id.* at 45-58.)

According to the testimony at trial, all of Aldairi's dental clinics and corporations use one

account at Broadway Bank, held under the name Dental Profile, for all of their banking needs.[5]

(Bankr. Case No. 08-17148, Dkt. Nos. 326 at 37:13-15, 41:10-17; 336 at 40:10-11.) All monies

generated from all locations go into that one account, and all expenses for all locations are paid

out of that one account. (*Id.*, Dkt. Nos. 326 at 41:10-12, 42:5-6; 336 at 57-60.) Additionally,

Aldairi's personal expenses are paid from the single account at Broadway Bank. (*Id.*, Dkt. Nos.

326 at 42:7-8; 336 at 139-46.) From 2007 through 2009, those personal expenses totaled $1.6

million, according to the testimony of Patricia Cosentino, an attorney and certified public

accountant, who reviewed a Quicken data file, tax returns, and other financial documents

provided to her by Abu Ghoush. (*Id.*, Dkt. Nos. 278 at 99:7-11, 108-09; 302 at 33-34.) The

evidence of record demonstrates that numerous checks were written against the Broadway Bank

account for a variety of Aldairi's personal expenses, including personal credit card payments,

house cleaning, residential utilities, car payments, and insurance payments. (*Id.*, Dkt. No. 336 at

139-46, 190-91.) Despite the commingling of funds, both Aldairi and Abu Ghoush testified that

---

[5] Aldairi suggested that he opposed a single account for all of his business and personal
banking. (*See* Bankr. Case. No. 08-17148, Dkt. No. 278 at 37:9-19.) Abu Ghoush testified,
however, that prior to establishing the account at Broadway Bank, Aldairi had accounts with eleven
different entities. (*See id.*, Dkt. No. 337 at 86-87.) According to Abu Ghoush, by maintaining a
single account at Broadway Bank, Aldairi was able "to consolidate all of [his] outstanding loan[s]
and to expand the line of credit secured by the accounts receivable from all of [the clinic]
locations." (*Id.* at 87:12-20; *see also id.* at 90:18-21.) Broadway Bank has an interest that is fully
secured by the assets of the Debtors, as well as the assets of every dental clinic owned by Aldairi.
(*Id.*, Dkt. Nos. 278 at 41-42, 90:16; 377 at 158.)

each deposit and expense is coded to indicate whether it is a personal or business entry and then,
further, each business entry is coded according to clinic location. (*Id.*, Dkt. Nos. 326 at 41:17-22,
42:7-11; 337 at 91:4-12, 92:23-25, 169-73.)

In addition to his dental businesses, Aldairi owns other companies, as well as various
pieces of real estate and personal property. According to his individual income tax return for
2008, he is the sole shareholder of an investment firm called Al Dairi Investment and also owns,
in whole or in part, a limited liability company by the name of Husgus LLC, the nature of which
is unknown. (*See* Debtors' Ex. 21; *see also* Aldairi 2004 Exam at 13-14.) As for real estate,
Aldairi owns a variety of residential properties, including a single-family home in Burr Ridge;
three single-family homes in Hinsdale; eight townhouses in Hinsdale; a condominium in the
South Loop; a lavish, 45,000-square-foot estate on 4.5 acres in Burr Ridge called the Villa Taj;
and a condominium in Miami, Florida. (Aldairi 2004 Exam at 25-41.) He also owns a
warehouse in Bridgeview, Illinois. (*Id.* at 42.) The current value of all of these properties is
unknown, although Aldairi testified that the purchase prices totaled many millions of dollars.
(*Id.* at 25-42.) He also stated that the mortgage on the Village Taj alone is $7.7 million.[6] (*See id.*
at 39:5-6.) According to Aldairi, most of the properties he owns are either unoccupied or being
rented, and all of the residential properties are currently in foreclosure. (*Id.* at 25-42; Bankr.
Case No. 08-17148, Dkt. No. 337 at 34-35.) Additionally, Aldairi has, or at one time had, at
least three luxury vehicles, including a Bentley that he acquired through either purchase or lease
in 2008. (*See* Bankr. Case. No. 08-17148, Dkt. No. 336 at 145-46.)

---

[6] According to Aldairi's testimony, construction on the Villa Taj began in 2006 and
concluded in about November 2008, after the filing of the bankruptcy petitions. (Bankr. Case No.
08-17148, Dkt. No. 278 at 79-80.)

Prior to its sale, Mendez worked in Aldairi's Melrose Park dental clinic. (*Id.* at 63:20-22.) During her employment there, she was subjected to "verbal and physical sexual advances and other sexual harassment." (Mot. for Sanctions, Ex. 2 at 1.) After being terminated, Mendez filed a complaint in the District Court for the Northern District of Illinois against Perla Dental, Dental Profile, and two of the doctors who directly participated in the harassment, alleging claims of, *inter alia*, gender discrimination, hostile work environment, and retaliatory discharge, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[7] (*See* Mot. for Sanctions, Ex. 2 at 2.) On April 26, 2007, the jury delivered a verdict in favor of Mendez on all claims and against defendants Perla Dental and Dental Profile and awarded Mendez damages in the amount of $781,181.25, of which $750,000 constituted punitive damages on the sexual harassment and retaliation claims.[8] (*Id.*, Exs. 1 & 2 at 2.) On March 26, 2008, the district court capped the compensatory and punitive damages award on the sexual harassment claim at $100,000, granted a motion filed by Mendez for liquidated damages under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, in the amount of $6,750, and reduced Mendez's final award to $387,931.25. (*See* Mot. for Sanctions, Ex. 2 at 40.)

Subsequently, Mendez issued citations to discover assets to various banks holding funds for the Debtors. (*Id.* at ¶ 6.) In response, Broadway Bank froze the single account of the Debtors. (Bankr. Case No. 08-17148, Dkt. Nos. 326 at 40:4-10, 54:12-18; 336 at 65:17-23.) On July 2, 2008, the day before citation proceedings were about to begin in the federal court, the

---

[7] According to its bankruptcy petition, Dentist, P.C. was also doing business as Perla Dental. (Bankr. Case No. 08-17149, Dkt. No. 1 at 1.)

[8] The two doctors named as defendants in the suit settled out of court. (*Id.*, Dkt. No. 326 at 46-47.)

Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (*See*

Bankr. Case No. 08-17148, Dkt. Nos. 1, 278 at 13:22-25; Bankr. Case No. 08-17149, Dkt. No. 1;

Mot. for Sanctions at ¶ 7.) They continued, however, to operate their dental clinics and manage

their financial affairs as debtors-in-possession until the cases were dismissed.

On August 5, 2008, the Debtors filed their schedules and statements of financial affairs.[9]

(*See* Bankr. Case. No. 08-17148, Dkt. Nos. 17 & 18; Bankr. Case No. 08-17149, Dkt. Nos. 21 &

22.) According to the schedules, Dental Profile's assets consisted primarily of $143,625 worth of

equipment used in its dental practice, as well as accounts receivable for the Montrose Avenue

and Addison Avenue locations totaling $854,620 as of the petition date. (Bankr. Case No. 08-

17148, Dkt. No. 17.) Dentist, P.C.'s assets came largely from dental equipment valued at

$37,225 and accounts receivable for the North Avenue location which totaled $126,086 as of the

filing of the petition. (Bankr. Case No. 08-17149, Dkt. No. 21.) The consolidated balance sheet

included with Dental Profile's schedules indicates that Aldairi, as the company's sole

shareholder, received a "distribution" of $677,306 in the year immediately preceding the filing of

the bankruptcy. (Bankr. Case No. 08-17148, Dkt. No. 17 at 10.) In response to question 3c in

the statements of financial affairs, which requires the disclosure of all transfers to insiders within

one year preceding the commencement of the case, however, both Debtors answered "None."

(Bankr. Case No. 08-17148, Dkt. No. 18, Question 3c; Bankr. Case No. 08-17149, Dkt. No. 22,

Question 3c.)

---

[9] According to a page appended to Schedule H of the Debtors' schedules, Dental, Ltd.,
Dental Profile Michigan, Ltd., Elgin Dental Profile, Ltd., Hyde Park Dental Profile, Ltd., North
Dental Profile, Inc., North Broadway Dental, Ltd., and Perla Dental 26th Street, L.L.C. are
codebtors "on each and every debt listed on schedules D, E and F." (*See* Bankr. Case No. 08-
17148, Dkt. No. 17; Bankr. Case No. 08-17149, Dkt. No. 21.)

The same day, August 5, 2008, the U.S. Trustee for the Northern District of Illinois (the "Trustee") convened the first meeting of creditors. (*See* Bankr. Case No. 08-17148, Dkt. No. 20 at ¶ 4.) Based on Aldairi's testimony at the meeting that the filed schedules were incorrect and did not include all of the assets of the Debtors, the Trustee suggested that the Debtors file an amended answer to question 3c, and the Debtors agreed to file the amendment by August 19, 2008.[10] (*Id.*) They failed to do so. They also failed to file monthly operating reports since the commencement of the cases. (*Id.* at ¶ 5.)

On August 19, 2008, Kurtz sent Bach an email message requesting production of various financial documents, including tax returns for Aldairi and all entities he owned or was affiliated with, bank statements, insurance policies, financial statements, loan documents, and a complete list of all companies owned by Aldairi. (Creditor's Ex. No. 34.) In response, Bach stated that he would pass the document request on to the Debtors for review. (*Id.*)

About two months later, on October 15, 2008, the Trustee filed a motion to convert the cases to those under Chapter 7 or, alternatively, to dismiss the cases. (*See* Bankr. Case No. 08-17148, Dkt. No. 20; Bankr. Case No. 08-17149, Dkt. No. 24.) What followed was a flurry of motions, filed by both the Trustee and Mendez, seeking to compel the Debtors and Aldairi to disclose pertinent financial information and, for most of those filings, corresponding orders entered by the Court granting the motions.

On January 26, 2009, for example, Mendez filed a motion seeking to conduct 2004

---

[10] During the hearing conducted on January 10, 2010, Stephen Wolfe, testifying on behalf of the Trustee, said that there had been "meaningful, sizable insider preferences, ... preferential payments . . . made to Dr. Aldairi within the one year before the filing of th[e] case." (Bankr. Case No. 08-17148, Dkt. No. 346-3 at 7:19-24.)

examinations of Aldairi and the Debtors' accountant Abu Ghoush and to subpoena records

concerning the Debtors' property and financial affairs. (*See* Bankr. Case No. 08-17148, Dkt. No.

34; Bankr. Case No. 08-17149, Dkt. No. 37.) That motion was granted on January 27, 2009 (*see*

Bankr. Case No. 08-17148, Dkt. No. 38; Bankr. Case No. 08-17149, Dkt. No. 39), and the 2004

examinations of both Aldairi and Abu Ghoush were taken on March 6, 2009.

Subsequent to those examinations, the Court entered an order on May 7, 2009, in

response to an oral motion for production made by Mendez. The order granted the motion and

directed the Debtors to produce, by May 11, 2009, various financial documents to Mendez's

attorney. (*See* Bankr. Case No. 08-17148, Dkt. No. 52; Bankr. Case No. 08-17149, Dkt. No. 48.)

These documents included: (1) Aldairi's 2007 personal tax return; (2) the accountant's electronic

copy of QuickBooks; (3) the Debtors' and Aldairi's financial statements submitted to any

financial or loan institution from 2003 to the present; and (4) the 2008 tax returns for the

Debtors, any related or affiliated entities, and Aldairi. (*Id.*) The Court ordered the Debtors to

prepare and file all overdue monthly operating reports by May 11, 2009 as well. (*Id.*) The

Debtors and Aldairi failed to comply.

Subsequently, on June 15, 2009, Mendez filed a motion for rule to show cause and

contempt. (*See* Bankr. Case No. 08-17148, Dkt. No. 54; Bankr. Case No. 08-17149, Dkt. No.

50.) On July 16, 2009, the Court entered orders setting new dates for compliance. (*See* Bankr.

Case No. 08-17148, Dkt. No. 73; Bankr. Case No. 08-17149, Dkt. No. 71.)

Together, the dockets of Dental Profile and Dentist, P.C. contain hundreds of entries,

many of which embody motions filed in an attempt to obtain financial information about the

Debtors. During the course of all of this activity, Dental Profile filed an amended statement of

financial affairs on April 28, 2009. (*See* Bankr. Case No. 08-17148, Dkt. No. 49.) It differed

from the original statement in two respects. First, in answer to question 3c, the amended

statement indicated that a payment of $386,300.21 was made to Aldairi and his wife Rawaa Attar

("Rawaa"). Under the column titled "Date of Payment" was the following text:

> A total of $386,300.21 was paid to or for the benefit of Aldairi and At[t]ar between
> 7/2/07 and 7/2/08 from all corporations of the debtor of which this is one. Not all
> distributions were from funds of this creditor. It is impossible to ascertain which funds
> were paid by which corporation as they were paid out of one fund.

In answer to question 23, which addresses withdrawals from a partnership or distributions by a

corporation, Dental Profile included the same text in the amended statement and also indicated

under the heading "Amount of Money or Description and Value of Property" that "[s]ome

portions w[ere] salary and others expenses paid:  A list detailing the distributions is available

upon request from debtor's counsel."

Similarly, but almost eight months later, on December 12, 2009, Dentist, P.C. also filed

an amended statement of financial affairs.  (*See* Bankr. Case No. 08-17149, Dkt. No. 32.)  It

differed from the original statement also in two respects.  The answer to question 9, which asked

about payments related to debt counseling or bankruptcy, noted that a sum of $5,000 had been

paid to Bach Law Offices in Northbrook, Illinois.  In answer to question 23, the amended

statement indicated that a payment was made to Aldairi and included the following text:

> H[u]sam Aldairi was paid by this corporation and other corporations owned by H[u]sam
> Alda[iri] the profits of this corporation and the other corporations as his salary prior to the
> filing of this case.  This was the method of salary paid to H[u]sam Aldairi prior to filing
> of this case. Subsequent to filing of this case, H[u]sam Aldairi was paid a regular salary
> per pay period.

Under the heading "Amount of Money or Description and Value of Property" was text indicating

-11-

that "[t]he exact amount paid by this corporation to H[u]sam Aldairi is being determined and when determined this answer will be amended." The answer to question 3c, "None," remained unchanged from the original statement.

In search of additional financial information, Mendez filed a motion on September 2, 2009, seeking to conduct 2004 examinations of Broadway Bank and Chase Bank, two of the Debtors' financial institutions, and to issue subpoenas and obtain records concerning the Debtors' property and financial affairs. (Bankr. Case No. 08-17148, Dkt. No. 97.) The Court entered an order granting the motion on September 13, 2009. (*Id.*, Dkt. No. 102.) Subsequently, on behalf of Aldairi, Husgus LLC, and Aya Dental Ltd., Johnson appealed the Court's order to the District Court for the Northern District of Illinois, and, in response to the appeal, Mendez filed a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Granting Mendez's motion to dismiss, the district court concluded that the order was unlikely to affect the outcome or further the course of the litigation and was likely only to delay the ultimate resolution of the case. *In re Dental Profile, Inc.*, No. 09 C 6160, 2010 WL 431590, at *2-4 (N.D. Ill. Feb. 1, 2010). Finding that the appellants failed to prove that the order was "too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated," *id.* at *3 (internal quotation omitted), the district court stated:

> Despite Appellants['] repeated assertions that the financial information "is not in any way relevant" to the bankruptcy case and "entirely separate" from the progress of the case, we accept the finding of the bankruptcy judge to the contrary. Judge Cox, who is intimately acquainted with all of the facts in the case, determined that "Dr. Aldairi is an integral part of the affairs of these debtors," and we see no reason to question that conclusion.

-12-

*Id.* (internal citations omitted).

On January 12, 2010, the Court entered two orders.  The first order denied confirmation of the Debtors' second amended joint plan of reorganization.  (Bankr. Case No. 08-17148, Dkt. No. 216.)  The second order dismissed the Chapter 11 cases and barred the Debtors from refiling for bankruptcy relief under any chapter of the Code for a period of two years.  (*Id.*, Dkt. No. 217; Bankr. Case No. 08-17149, Dkt. No. 109.)  In dismissing the cases, the Court stated:

> The purpose of bankruptcy is to help honest debtors to make a fresh start.  I cannot say that those ideals are present in this case.  Th[ese] debtor[s] refuse[ ] to cooperate with any of the court processes consistently. . . . [T]here's no intent to reorganize.  Confirmation has been denied.  There's no cooperation.  The debtor[s] [are] not taking this process seriously.  The only purpose of filing bankruptcy is to delay the collection of the judgment from creditor Mendez.  I accept [the Trustee's] position.  I'm going to grant the motion.  I will dismiss the case.

(Bankr. Case No. 08-17148, Dkt. No. 346-3 at 50:6-18.)  During the proceedings on the same day, the Court also formally designated Aldairi as the person responsible in connection with the corporate entities under Federal Rule of Bankruptcy Procedure 9001(5).  (*See id.* at 61:21-23; Dkt. No. 218 at ¶ 2.)

On February 12, 2010, Mendez filed the instant motion for sanctions.  (Bankr. Case No. 08-17148, Dkt. No. 228.)  Subsequently, the motion was fully briefed, and the Court held ten days of hearings, commencing on May 20, 2010 and concluding on December 20, 2010.

On November 5, 2010, the Debtors, Aldairi, Bach, and Johnson filed a motion for sanctions against Kurtz, asking the Court to suspend her from practicing in the Bankruptcy Court for the Northern District of Illinois, to deny Mendez's motion for sanctions, to award the movants attorneys' fees and costs incurred in connection with their motion, and to assess a monetary fee against Kurtz.  (*Id.*, Dkt. No. 329.)  According to the motion, Kurtz went beyond

-13-

the Court's order of November 30, 2009, which required the Debtors to allow for the inspection

and imaging of their computers and programs (*see id.*, Dkt. No. 166), by improperly viewing and

photographing documents containing Aldairi's personal and confidential information. The

movants also claimed that Kurtz violated Rule 34 of the Federal Rules of Civil Procedure by

failing to provide notice that her legal assistant was going to get her teeth cleaned at Dentist, P.C.

after the proceedings had begun for the purpose of writing a check to be used at trial. On

February 17, 2011, the Court entered an order denying the motion, finding that the documents

photographed were in plain view, that the inspection was conducted in an orderly fashion, and

that Kurtz's legal assistant entered the dental clinic as a paying customer and, as such, was

invited to do so. (*See id.*, Dkt. No. 372.)

The Court has reviewed over 1,800 pages of transcript generated from the hearings

conducted in the sanctions motion against the Debtors, Aldairi, Bach, and Johnson, along with

the briefs and scores of exhibits provided by all attorneys, and is now ready to rule.

### III. DISCUSSION

Mendez asks the Court to impose as sanctions against the Debtors, Aldairi, and Bach the

reimbursement of all attorneys' fees and costs incurred by her during the Debtors' bankruptcy

case pursuant to Federal Rule of Bankruptcy Procedure 9011 and section 105(a) of the Code.

She contends that the Debtors, Aldairi, and Bach violated Rule 9011 by filing the bankruptcy for

the improper purpose of delaying her from collecting her judgment and that, accordingly, the

filing was an abuse of the bankruptcy process in violation of section 105(a). Mendez also

requests that both Bach and Johnson be disgorged of any attorneys' fees that they accepted

-14-

throughout the pendency of the bankruptcy proceedings–Bach for filing the bankruptcy petition

and Johnson for filing an appeal of the Court's order allowing for the Rule 2004 examinations of

Broadway Bank and Chase Bank–both allegedly for the improper purpose of delaying Mendez

from collecting on her judgment.

## A. Sanctions Under Bankruptcy Rule 9011

Bankruptcy Rule 9011 is modeled after Federal Rule of Civil Procedure 11 and is

"essentially identical" to Rule 11. *In re Park Place Assocs.*, 118 B.R. 613, 616 (Bankr. N.D. Ill.

1990). Rule 11 was amended in 1993 to add various notice requirements, and the same

amendments were later made to Bankruptcy Rule 9011, effective in 1997. Thus, courts

frequently look to cases that interpret Rule 11 when construing Bankruptcy Rule 9011. *In re*

*Famisaran*, 224 B.R. 886, 894 (Bankr. N.D. Ill. 1998). Further, some Rule 11 cases decided

before the procedural amendment are still applicable in analyzing Bankruptcy Rule 9011 because

the substantive provisions were not changed. *See In re Collins*, 250 B.R. 645, 659 (Bankr. N.D.

Ill. 2000); *State Bank of India v. Kaliana (In re Kaliana)*, 207 B.R. 597, 601 (Bankr. N.D. Ill.

1997).

"The central goal of Rule 11 is to deter abusive litigation practices." *Corley v. Rosewood*

*Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1013 (7th Cir. 2004). The Rule is not intended to

function as a fee-shifting statute requiring the losing party to pay fees and costs. *Kaliana*, 207

B.R. at 601 (*citing Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 932 (7th Cir. 1989)

("Rule 11 is not a fee-shifting statute in the sense that the loser pays.")). Instead, the Rule

focuses on the conduct of the parties–not the results of the litigation. *Id.* "Rule 11 sanctions are .

. . to be granted sparingly" and "should not be imposed lightly." *Lefkovitz v. Wagner*, 219 F.R.D.

592, 592-93 (N.D. Ill. 2004), *aff'd*, 395 F.3d 773 (7th Cir. 2005).

Rule 9011 provides in relevant part as follows:

(b) **Representations to the Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,–

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) **Sanctions.** If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall

-16-

describe the specific conduct alleged to
violate subdivision (b). It shall be
served as provided in Rule 7004. The
motion for sanctions may not be filed
with or presented to the court unless,
within 21 days after service of the
motion (or such other period as the court
may prescribe), the challenged paper,
claim, defense, contention, allegation, or
denial is not withdrawn or appropriately
corrected, except that this limitation
shall not apply if the conduct alleged is
the filing of a petition in violation of
subdivision (b). If warranted, the court
may award to the party prevailing on the
motion the reasonable expenses and
attorney's fees incurred in presenting or
opposing the motion. . . .

. . . .

(2) Nature of Sanction; Limitations. A sanction
imposed for violation of this rule shall be limited to
what is sufficient to deter repetition of such conduct
or comparable conduct by others similarly situated.
Subject to the limitations in subparagraphs (A) and
(B), the sanction may consist of, or include,
directives of a nonmonetary nature, an order to pay
a penalty into court, or, if imposed on motion and
warranted for effective deterrence, [an] order
directing payment to the movant of some or all of
the reasonable attorneys' fees and other expenses
incurred as a direct result of the violation.

. . . .

(3) Order. When imposing sanctions, the court shall
describe the conduct determined to constitute a
violation of this rule and explain the basis for the
sanction imposed.

Fed. R. Bankr. P. 9011(b) & (c).

At the outset, the Court notes that Mendez failed to comply with the "safe harbor"

requirement under Rule 9011(c)(1)(A). That provision gives the offending party the opportunity,

within twenty-one days after service of a motion for sanctions, to withdraw or correct the

offending pleading in order to avoid the imposition of sanctions. *Divane v. Krull Elec. Co.*, 200

F.3d 1020, 1025-26 (7th Cir. 1999) (noting that the provision was designed to give the offending

party a "full and fair opportunity to respond and show cause before sanctions are imposed");

*Kitchin*, 327 B.R. at 359-60. The provision "serves the laudable purpose of requiring litigants to

dispose of frivolous claims without judicial involvement." *Kitchin*, 327 B.R. at 361.

The filing of a bankruptcy petition, however, is expressly excluded from the "safe harbor"

provision. Fed. R. Bankr. P. 9011(c)(1)(A). "[T]he filing of a petition has immediate serious

consequences . . . which may not be avoided by a subsequent withdrawal of the petition." *In re*

*Snyder*, No. 10-32042, 2011 WL 612254, at *1 (Bankr. E.D. Wis. Feb. 11, 2011). Thus,

Mendez's contention that the Debtors, Aldairi, and Bach violated Rule 9011 by filing the

bankruptcy for an improper purpose falls within the exception to the "safe harbor" provision.

Johnson, on the other hand, may not be sanctioned under Rule 9011 because she was not given

the opportunity to withdraw or correct any challenged papers and she had no involvement in the

filing of the Debtors' petitions. *See Divane*, 200 F.3d at 1025 (finding that a court that imposes

sanctions requested by motion without adhering to the twenty-one day "safe harbor" provision

abuses its discretion.); *In re McNichols*, 258 B.R. 892, 902-03 (Bankr. N.D. Ill. 2001)

(explaining that the provision is a "mandatory procedural prerequisite" and that "sanctions

imposed without compliance are improper").

Turning to the substance of the motion, the Court may impose sanctions against the

-18-

Debtors, Aldairi, and/or Bach if it finds a violation of any one of the four subdivisions of Bankruptcy Rule 9011(b). *See Collins*, 250 B.R. at 661. Rule 9011(b) provides that upon presenting a document to the court, a party or his counsel represents that to the best of that person's knowledge, information, and belief, formed after a reasonable inquiry under the circumstances, such document is not (1) presented for any improper purpose, (2) based on frivolous legal arguments, (3) without adequate evidentiary support for its allegations, and (4) without a basis for denials of fact. *See* Fed. R. Bankr. P. 9011(b)(1)-(4). "[T]he four subdivisions of Rule 9011(b) fall into two general categories: the 'frivolousness' clauses (or the 'objective component') and the 'improper purpose' clause (or the 'subjective component')." *Am. Telecom*, 319 B.R. at 867.

The part of Rule 9011 at issue in this case is the "improper purpose" clause in subsection (b)(1). The focus of a claim under the "improper purpose" clause is on why the nonmovant filed the legal pleading at issue. *Collins*, 250 B.R. at 661. Because direct evidence of motive, intent, or purpose is rarely available at hearings, the Court must look to "objectively ascertainable circumstances that support an inference" of improper purpose under Rule 9011(b)(1). *See id.* at 662 (internal quotation omitted); *see also Beeman v. Fiester*, 852 F.2d 206, 209 (7th Cir. 1988), *overruled on other grounds, Mars Steel*, 880 F.2d 928.

Here, the history of the litigation among the parties and the testimony at trial create a strong inference that the petitions were filed for the improper purpose of delaying Mendez from collecting her judgment. A substantial judgment entered against a debtor is often the trigger for the filing of bankruptcy. *See, e.g., In re Am. Telecom Corp.*, 304 B.R. 867, 873 (Bankr. N.D. Ill. 2004); *In re Elmes*, 289 B.R. 100, 103 (Bankr. N.D. Ill. 2003); *see also* Bankr. Case No. 08-

-19-

17148, Dkt. No. 346-3 at 7:2-5 ("[T]hese cases are not unlike many Chapter 11 cases . . . filed

after a judgment is entered against a debtor."). Many potential debtors file for relief because they

have no way to pay such a judgment without some form of restructuring. The Debtors

acknowledge in their joint disclosure statement that the judgment in the district court case was,

indeed, "what caused [them] to file the[ir] bankruptcy cases." (*See* Bankr. Case 08-17148, Dkt.

No. 133 at 8.)

      The evidence of record, however, demonstrates that the petitions were filed not in an

effort to restructure the Debtors' businesses in order to pay the judgment but, rather, with an

intent to hinder Mendez in her collection efforts. Mendez claims that during a recess

immediately following the jury's verdict in the district court case, Aldairi stated to his lawyer,

intentionally loud enough for Kurtz to hear, that he "needed a good bankruptcy attorney."[11]

(Mot. for Sanctions at ¶ 5; *see also id.*, Ex. 3 at ¶ 3.) The conclusion to be drawn from the

remark, Mendez suggests, is that Aldairi was planning to file for relief in an attempt to avoid

paying the judgment debt. Such a conclusion is bolstered by Bach's testimony regarding his

discussion with Aldairi during an initial meeting that took place more than a year after the entry

of the judgment but prior to the bankruptcy filing. Specifically, Bach testified that Aldairi, in

talking about the judgment, "did not think it was the right decision; ... he should have won ...

[and] he really didn't feel like he owed any money." (Bankr. Case No. 08-17148, Dkt. No. 376

at 78:6-12.) In fact, Aldairi told Bach at that initial meeting that he did not want Mendez to get

paid. (*Id.* at 80:7-9.) Although Bach testified that he was able to change Aldairi's "opinion"

---

      [11] Aldairi testified, without credibility, that he never made such a statement. (Bankr. Case
No. 08-17148, Dkt. No. 377 at 140-41.)

-20-

prior to the filing of the bankruptcy cases (*id.* at 80:22-25), the Court is not convinced that Aldairi actually had such a change of heart.

Rather, the evidence shows that subsequent to the filing of the petitions, the Debtors and Aldairi simply had no intention to reorganize the businesses in order to pay Mendez's judgment. In particular, the record demonstrates that the Debtors and Aldairi were uncooperative and unresponsive to the plethora of requests to turn over financial information and that they continuously failed to abide by the Court's orders regarding the disclosure of information. It is clear that Aldairi was heavily reliant on his accountant with respect to all financial matters generally (*see, e.g., id.*, Dkt. No. 278 at 90-91), and he testified that it was Abu Ghoush who handled all of the daily "tasks that needed to be performed in the bankruptcy" as well. (*Id.*, Dkt. No. 326 at 66-67.) According to the testimony, Aldairi had specifically told Abu Ghoush to provide Bach with all information and financial documents that were requested, and he "believed [he] gave everything [he] ha[d]." (*Id.* at 72:16-17; *see also id.* at 70:4-13, 103:16-19, 104-05; Dkt. No. 278 at 86:13-17.) Contrary to this belief, however, an abundance of financial documents was not produced. Tax returns, the accountant's electronic copy of the Debtors' records, and financial statements provided to financial and loan institutions had not been provided to Mendez's attorney by May 7, 2009, more than ten months after the filing of the petitions.[12] (*See id.*, Dkt. No. 52.) By September 13, 2009, over one year subsequent to the

---

[12] Throughout the trial, a great deal of time and attention was spent on which software program–QuickBooks or Quicken–was used by Abu Ghoush in maintaining the Debtors' financial records. According to Abu Ghoush, he misspoke when he said during his 2004 examination that the software program used by the Debtors was QuickBooks; the program actually used, he stated, was Quicken. (Bankr. Case No. 08-17148, Dkt. No. 337 at 102:5-15, 104-08.) Thus, in response to the Court's orders of May 7, 2009 and July 16, 2009 requiring the Debtors to produce the accountant's "copy of Quick[B]ooks with its original integrity maintained," Abu Ghoush testified

filing, financial statements, loan documents, agreements executed to repay loans, loan

evaluations, collateral reports, and banking information also had not been turned over to Kurtz.

(*See id.*, Dkt. No. 102.) Court orders requiring the production of all of these documents went

unheeded.  In fact, Mendez had to hire, at her own expense, a computer analyst to conduct an

inspection of the Debtors' computer records in order to get enough information to provide a

complete and accurate picture of the Debtors' financial situation.  (*See id.*, Dkt. Nos. 166 at ¶ 7;

350-2 at ¶ 3.) Debtors who intend to reorganize their businesses and pay their creditors are not

uncooperative and do not fail to disclose pertinent financial information.  Nor do they fail to

abide by court orders.

Moreover, the Court essentially decided on January 12, 2010 that the Chapter 11 cases

had been filed for an improper purpose when it issued its dismissal ruling and barred the Debtors

from refiling for a period of two years. (*See id.*, Dkt. No. 217; Bankr. Case No. 08-17149, Dkt.

No. 109.) In reaching its decision to dismiss, the Court explained that the cases involved no

discernable bankruptcy objectives, that the Debtors had no intention of reorganizing, and that the

cases had been used simply as a delay tactic to frustrate Mendez and hinder her collection efforts.

(*See* Bankr. Case No. 08-17148, Dkt. No. 346-3 at 43:9-19; 50:6-18.)   The Court will not

backtrack now and say that the Debtors' motives in filing the case were consistent with the

intended purposes of the Bankruptcy Code.

Aldairi, naturally, contends that the petitions were not filed for an improper purpose.

---

that he did not turn over that item because the Court "asked for something [he] d[id] not have." (*Id.*
at 110:9-10.) Clearly, what the Court was directing the Debtors to produce were its financial
records–in whichever program they were maintained.  Abu Ghoush's response is indicative of the
evasive and disingenuous attitude that both he and Aldairi exhibited with respect to the disclosure
of information subsequent to the filing of the petitions.

Rather, he claims that financial hardship, precipitated by the economic downturn, was the reason that the bankruptcy cases were filed. (*Id.*, Dkt. Nos. 278 at 36-37; 377 at 153.) Aldairi testified that many of his patients are on public aid and that the Debtors were not receiving the corresponding public aid payments from the State of Illinois on a regular two-week basis as they had in the past. (*Id.*, Dkt. Nos. 326 at 21:9-20; 377 at 145; *see also* Aldairi 2004 Exam at 60-62.) Additionally, the rent being paid for properties on which various dental clinics were located was very high, and Aldairi's efforts to renegotiate the leases were unsuccessful. (Bankr. Case No. 08-17148, Dkt. Nos. 326 at 26:21; 337 at 96:24-25; 377 at 153-54.) A liability to the Internal Revenue Service of more than $450,000 and some "bad decisions" to expand the dental clinics to additional locations compounded the Debtors' financial problems. (*Id.*, Dkt. Nos. 278 at 90:3-4; 337 at 97:11-20; 377 at 156-57.) According to the testimony, after the entry of the district court judgment and the issuance of the citations to discover assets, Broadway Bank froze the Debtors' account, and it was for that reason that bankruptcy was considered and the petitions subsequently filed. (*Id.,* Dkt. Nos. 278 at 37; 337 at 98:4-18.)

The Court does not find Aldairi's testimony credible with respect to the reasons for filing the petitions. The Court is in the best position to assess the credibility of the witnesses and to weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (stating that deference is given to a trial court's findings that involve the credibility of witnesses because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"); *Torres v. Wis. Dep't of Health & Soc. Servs.*, 838 F.2d 944, 946 (7th Cir. 1988) (*citing Anderson*). "[A] court ... may take into account a witness'[s] interest in the outcome of the case, his intentions, his seeming

-23-

honesty, and his conduct on the witness stand." *6050 Grant, LLC v. Hanson (In re Hanson)*, 428

B.R. 475, 490 (Bankr. N.D. Ill. 2010) (internal quotations omitted).

The Court initially notes that Aldairi was impeached at trial with his deposition

testimony. Although the instances of impeachment focused on related collateral issues, the Court

observed Aldairi's demeanor and finds that his testimony is not credible. Additionally, the

documentary evidence tends to negate Aldairi's testimony.

Although Aldairi relied heavily on Abu Ghoush with respect to financial matters, he

testified that he did not know virtually anything about his businesses–or anything else he was

asked about on the stand. He was unclear as to how many dental clinics he had and which clinics

operated under which corporate entity. (Bankr. Case No. 08-17148, Dkt. Nos. 326 at 208-14;

336 at 73:13-15, 106:14-16.)  He did not know how much his companies made in any given year

(*see, e.g.*, *id.*, Dkt. No. 278 at 68-69), whether he borrowed money from the Debtors (*id.* at

70:14-20), whether the Debtors made any payments to Broadway Bank after the dismissal of the

bankruptcy cases (*id.* at 73:10-15), or that one of his corporations had been involuntarily

dissolved in 2007 (*id.*, Dkt. No. 326 at 214:14-17).  He claimed that he did not know to whom he

sold one or more of his clinics (*id.* at 223:17-19), the name of the company for which he was

overseeing the construction of a clinic in California (*id.,* Dkt. No. 336 at 8:11-13), whether the

sale of the Melrose Park location was listed anywhere in his bankruptcy disclosures (*id.* at 95:13-

24), or whether documents reflecting the sale of various clinics were produced to his attorneys

(*id.* at 96-97).

Aldairi testified that he did not really understand what was on his tax returns, although he

signed them. (*Id.,* Dkt. No. 278 at 92:6-9.) He was not certain if he was getting a salary from

either of the Debtors (*id.*, Dkt. 326 at 16:13-15) or if his wife was paid a salary in 2009 (*id.* at 168-69). He did not know if permission was sought from the Court either to make payments out of the Debtors' account for his personal expenses (*id.* at 176:2-4) or to make payments to Broadway Bank (*id.*, Dkt. No. 336 at 138:22-25), and he testified that he did not know if the account number on the Broadway Bank account was changed after the citations to discover assets were served (*id.* at 44:1-4).

Incredibly, Aldairi did not know the address of the house in California where his wife and children currently live (*id.*, Dkt. No. 326 at 112:13-23), the addresses of most of the real estate properties he owns (*id.* at 115-16), or whether he had a separate personal bank account at MB Financial (*id.* at 145-46). He did not know his bank account numbers or whether all of his corporations used the same account (*id.* at 153:18-20); he did not know into which account checks were deposited from his various businesses (*id.* at 156-57); he did not know how much he paid Johnson for her work in the bankruptcy proceedings (*id.*, Dkt. No. 336 at 172:3-12), and he did not remember representing to Broadway Bank three months before the filing that he had business and personal assets totaling over $30 million (*id.* at 197-98).

Given all of this testimony, it simply strains credulity that Aldairi knew and was able to articulate why the petitions for bankruptcy had been filed when he knew nearly nothing about his businesses, his finances, or virtually anything else. Further, contrary to Bach's testimony, which the Court finds credible, Aldairi denied saying that he told Bach that he did not want to pay Mendez (*id.*, Dkt. No. 326 at 187:4-21) and, in fact, claims that at no point did he say that he was not willing to pay the judgment (*id.* at 188:8-9).

The Court concludes that Bankruptcy Rule 9011(b)(1) was violated by the filing of the

-25-

Chapter 11 cases to delay, frustrate, and cause expense to Mendez. The remaining questions are whether to impose sanctions and, if so, what kind to impose and on whom.

The imposition of sanctions under Rule 9011 is discretionary rather than mandatory. *See In re Generes*, 69 F.3d 821, 827 (7th Cir. 1995). Among the sanctions that may be imposed for violating the Rule are fines payable to the court clerk, an award of attorneys' fees and costs to the sanctioned party's opponent, the disgorgement of fees paid to the sanctioned attorney, an injunction prohibiting specific types of future filings, mandatory legal education, stricken pleadings, referrals to disciplinary bodies, and reprimands either on or off the record. *Am. Telecom*, 319 B.R. at 873. In determining the appropriate sanction, courts may consider Rule 9011's multiple purposes of punishment, deterrence, and compensation; the severity of the violation; any resultant delay; and a sanctioned party's ability to pay the sanctions. *Id.*

Based on the evidence of record, the Court will impose sanctions by requiring that Mendez be returned to her position immediately prior to the filing of the Debtors' petitions. *See Mars Steel*, 880 F.2d at 939. The severity of the Rule 9011 violation, the compensable nature of the fees that Mendez incurred, and the extensive delay that Mendez experienced all warrant an award of attorneys' fees and costs. *See Am. Telecom*, 319 B.R. at 874.

In assessing sanctions, the Court notes that the severity of the sanctions imposed should be proportionate to the violation and not more than what is sufficient to discourage future bankruptcy filings under similar circumstances. *See Fed. R. Bankr. P. 9011(c)(2)*; *Collins*, 250 B.R. at 667; *Union Nat'l Bank of Marseilles v. Leigh (In re Leigh)*, 165 B.R. 203, 232 (Bankr. N.D. Ill. 1993). In particular, the award of attorneys' fees and expenses is limited to the reimbursement for legal costs directly resulting from the filing of the petition. *See Am. Telecom*,

-26-

319 B.R. at 874; *In re King*, 83 B.R. 843, 848 (Bankr. M.D. Ga. 1988). An award of attorneys'

fees incurred in pursuit of the ruling on the Rule 9011 motion itself is permitted under the Rule.

*See* Fed. R. Bank. P. 9011(c)(1)(A).

Mendez requests sanctions totaling $314,536.34. Of that amount, $300,071.00

constitutes attorneys' fees incurred in connection with the filing of the Debtors' petition, and

$14,465.34 represents expenses. (*See* Bankr. Case No. 08-17148, Dkt. No. 356.) According to

the supplemented fee petition dated December 23, 2010, the legal work was conducted by ten

different individuals at or affiliated with Kurtz's law firm and billed at varying hourly rates, from

$100 to $350, depending on the individual. All of the entries relate to time spent on legal work

necessitated by the improper filing: review and analysis of documents, drafting, research, oral-

argument preparation, court appearances, case administration, and correspondence in connection

with the multiple motions filed and proceedings held from July 6, 2008 through December 21,

2010. The Court finds that the amount of time spent on these activities, as well as the

enumerated expenses, is reasonable. The motion was fully contested, and the many hours were

expended in an effort to get information from debtors who were uncooperative and unwilling to

provide that information without intervention.

The only remaining determination are the entities against whom the fees and costs will be

assessed. Johnson repeatedly asserted throughout the proceedings that Aldairi may not be

sanctioned, under Rule 9011 or otherwise, because he is not the debtor, his financial affairs are

not pertinent to the matter at bar, and his conduct is irrelevant to the issue of whether or not the

bankruptcy was filed for an improper purpose. (*See e.g., id.*, Dkt. No. 278 at 17:18-25, 80:13-

21.) Johnson is mistaken.

All signatories to a voluntary petition, including bankruptcy counsel and a corporate debtor's president, subject themselves to Bankruptcy Rule 9011. *Am. Telecom,*, 319 B.R. at 875; *Collins*, 250 B.R. 662 ("A signature on a paper presented to the court is a certification that the paper has not been presented for any improper purpose, such as harassment or delay."); *see also Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1572 (11th Cir. 1995); *E. Diversified Distribs., Inc. v. Matus (In re Matus)*, 303 B.R. 660, 682-83 & n.19 (Bankr. N.D. Ga. 2004); *In re Start the Engines, Inc.*, 219 B.R. 264, 268-72 (Bankr. C.D. Cal. 1998). The attorney signing the document is typically the person against whom the sanction should be imposed, unless the evidence establishes that the client actually misled the attorney. *See Collins*, 250 B.R. at 660-61. Assessing sanctions against a represented party–or its controlling officer–or imposing joint and several liability along with the lawyer requires additional findings of separate responsibility based on the knowledge, participation, and involvement of the party. *Chi. Bank of Commerce v. Amalgamated Trust & Sav. Bank (In re Mem'l Estates, Inc.)*, 116 B.R. 108, 112 (N.D. Ill. 1990); *Am. Telecom*, 319 B.R. at 875.

In the case at bar, the Court has made those additional findings. The petitions of the Debtors were signed by both Bach as Debtors' counsel and Aldairi as president of both corporations. In addition, Aldairi was formally designated as the person responsible for the corporate Debtors under Bankruptcy Rule 9001(5). Aldairi is a businessman who owns and controls both of the Debtor corporations and various other corporate entities, including his own investment firm. By his own admissions, he has been involved in multi-million dollar business deals. Despite his claims of ignorance and his reliance on the Debtors' accountant, the Court finds that Aldairi was instrumental in making the tactical decision to file the petitions. Thus, the

-28-

Court imposes the Rule 9011 sanctions on both Aldairi and the Debtors.[13]

As for Bach, there is simply not enough evidence to demonstrate that he filed the bankruptcy petitions for an improper purpose and is thus sanctionable under Rule 9011. According to his testimony, Bach met with Aldairi, Abu Ghoush, Rawaa, and Milan Roncevic, the business manager for the Debtors at the time, prior to the filing of the petitions. (Bankr. Case No. 08-17148, Dkt. No. 376 at 58:8-22, 69:20-22.) At those meetings, he explained the Chapter 11 process, the obligations of the debtor under a Chapter 11 bankruptcy, and various alternatives to bankruptcy. (*See id.* at 61:8-24, 65:3-24, 73:20-25, 74:4-8, 75:1-17, 84:8-21.) He discussed the documents that he would need to review, including financial statements and tax returns, and the general financial state of Dental Profile and Dentist, P.C. (*Id.* at 61-62; 87-92.) Additionally, he explained the need for cooperation in getting a plan confirmed, and he emphasized the importance of disclosure. (*Id.* at 65:19-24; 74:16-25.)

Bach also expressly discussed with Aldairi the entry of the district court judgment and Aldairi's desire that Mendez not get paid. In response, Bach told Aldairi "[t]hat if he wanted to go forward with th[e] case, ... he needed to be more reasonable" and that he could not "go in there saying I'm not going to pay anything to this party, especially when [that party is] active in the bankruptcy." (*Id.* at 80:13-20.) Bach testified that he was able to change Aldairi's opinion

---

[13] During the trial, Kurtz went to great lengths to show that Aldairi commingled funds and diverted assets of the Debtors for his own personal use, with the ultimate purpose, the Court supposes, of demonstrating that there was a unity of interest and ownership between Aldairi and the Debtor corporations such that the corporations were actually Aldairi's alter ego. *See, e.g., Wachovia Secs., LLC v. Jahelka,* 586 F. Supp. 2d 972, 990-91 (N.D. Ill. 2008). Although the evidence of record clearly establishes both improper commingling and diversion of assets, the Court need not pierce the corporate veil to prevent Aldairi from hiding behind the corporations to avoid being sanctioned for his wrongdoing. As discussed *supra,* Aldairi's signing of the voluntary petitions subjects him to sanctions under Rule 9011.

and that he would not have taken the bankruptcy case as the attorney for the Debtors if had not been able to do so. (*Id.* at 81-82.)

Prior to the filing of the petitions, Bach testified that he performed due diligence. He contacted Broadway Bank, assembled relevant financial documents, learned more about the financial challenges facing Dental Profile and Dentist, P.C., and suggested various ways for them to reduce their expenses. (*Id.* at 67:21-25, 71:12-23, 88-91.)

The Court finds that Bach's testimony is credible and that Aldairi ultimately misled Bach with respect to the filing of the petitions. Based on Bach's testimony and a lack of evidence to prove otherwise, the Court concludes that Bach did not file the bankruptcy petitions for an improper purpose. Accordingly, Rule 9011 sanctions will be assessed solely against Aldairi and the Debtors.

### B. Sanctions Under Section 105(a)

Mendez also seeks to have sanctions imposed on the Debtors, Aldairi, Bach, and Johnson under section 105(a) of the Code. *See* 11 U.S.C. § 105. Specifically, she requests that attorneys' fees and costs be assessed against the Debtors, Aldairi, and Bach for abusing the judicial process by filing the petitions solely to thwart Mendez from collecting on her judgment. She also asks the Court to disgorge any attorneys' fees accepted by Bach and Johnson throughout the bankruptcy proceedings.

Section 105(a) confers both statutory and inherent authority upon bankruptcy courts to impose sanctions. *Liquidating Grantor's Trust of Proteva, Inc. v. Finova Capital Corp. (In re Proteva, Inc.)*, 271 B.R. 569, 573 (Bankr. N.D. Ill. 2001). The statute provides as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). Section 105 gives the Court "broad powers ... to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process." *See McNichols*, 258 B.R. at 903 (*quoting Volpert*, 110 F.3d at 500). Despite the open-ended language of section 105(a), courts must exercise caution to limit the circumstances in which it is used. *Disch v. Rasmussen*, 417 F.3d 769, 777 (7th Cir. 2005). "Otherwise, there is a real risk that more particular restrictions found throughout the Code would amount to nothing, because the court could always use the residual equitable authority of § 105(a)." *Id.* Thus, in imposing sanctions, a court should ordinarily rely on authority conferred by statutes and procedural rules, rather than on its inherent power, if the sources of authority serve the purposes of the court. *In re Rimstat, Ltd.*, 212 F.3d 1039, 1048 (7th Cir. 2000) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1058-59 (7th Cir. 1998)). However, "a sanctioning court is not required to apply available statutes and procedural rules in a piecemeal fashion where only a broader source of authority is adequate to justify all the necessary sanctions." *Rimstat*, 212 F.3d at 1049 (*citing Chambers*, 501 U.S. at 50-51).

"Sanctions are justified under § 105(a) where the sanctioning court has clearly found that a litigant 'intentionally abused the judicial process in an unreasonable and vexatious manner.'" *Collins*, 250 B.R. at 657 (*quoting Rimstat*, 212 F.3d at 1047). A court may use its statutory sanctioning authority under section 105(a) if the court finds that the judicial process has been abused. *See id.* at 656-57. When the filing of a bankruptcy petition is motivated by a desire to

-31-

delay a creditor from enforcing its rights in an ongoing dispute, the filing is an abuse of process.

*Id.* at 657 (*citing Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd., Inc.*), 40 F.3d 1084, 1085,

1090 (10th Cir. 1994)). Additionally, where a party unreasonably prolongs litigation, it is within

the court's inherent equitable authority to require that party to pay attorneys' fees. *Eliscu v.*

*Banks (In re Eliscu)*, 139 B.R. 883, 886 (N.D. Ill. 1992).

Because the sanctions allowed under Rule 9011 serve the Court's purposes, the Court

relies on Rule 9011, rather than on its inherent power under section 105(a), in imposing sanctions

on the Debtors and Aldairi. *See Rimstat*, 212 F.3d at 1048. As for the payment of Mendez's

attorneys' fees by Bach, the Court finds that there is not enough evidence to establish that he

intentionally abused the judicial process in an unreasonable or vexatious manner, that he was

motivated by a desire to delay Mendez from collecting her judgment, or that he unreasonably

prolonged the litigation.

First, no credible evidence establishes that Bach was motivated by a desire to delay

Mendez's collection efforts. As discussed *supra*, at meetings conducted prior to the bankruptcy

filings, Bach expressly explained to Aldairi that he would not file the petitions unless Aldairi

understood that the Mendez judgment needed to be paid and Aldairi was willing to cooperate and

be "reasonable."

Further, Bach's testimony credibly demonstrates that any delays resulting from the

production of financial information were neither an intentional abuse of the judicial process nor a

deliberate desire to unreasonably prolong the litigation. According to his testimony, all

documents that Bach received came from Abu Ghoush (Bankr. Case No. 08-17148, Dkt. No. 377

at 17:17-22), and getting financial information through Abu Ghoush "in any timely manner was

always next to impossible" (*id.*, Dkt. No. 376 at 110:17-23). For that reason, Bach said, the
operating reports were usually late. (*Id.* at 110:23-25.) "Every time that I had to go to Dr.
Aldairi because I just wasn't getting any answer," Bach said, "I would always get a phone call a
couple hours later telling me that they'll have the stuff to me or do it for me the next day, which
usually was an empty promise, unfortunately." (*Id.* at 111:14-20.) According to Bach, each time
he got a request for documents, he forwarded it to his client and then, in turn, provided copies of
whatever he received to Mendez's attorney. (*See, e.g., id.* at 118:4-12.)

In addition to the operating reports, Bach admitted that the debtor-in-possession reports
were also filed late as a general rule. According to Bach, he spent an inordinate "amount of time
yelling and screaming at ... Abu Ghoush and his staff to get [those reports] done. There must
have been four or five different versions that were done completely incorrect ... [and] had all the
wrong information ... ." (*Id.* at 130:19-24.) Bach ultimately received the reports in the requested
format, he said, only because he threatened to withdraw as the Debtors' attorney. (*Id.* at 131:2-
8.) Although he suggested to Aldairi on a number of occasions that he needed to find a new
accountant, Aldairi told Bach that he did not want to replace Abu Ghoush because of his long-
standing relationship with him. (*Id.*, Dkt. No. 377 at 118:1-16.)

On cross examination, Bach testified that he did "everything in [his] power to get [the
debtor-in-possession] reports filed." (*Id.* at 53:15-16.) Although he did not advise the Court that
the late reports were the result of problems he was having with Abu Ghoush, Bach stated that he
had had discussions about these problems with the Trustee and that the Trustee had told him that
such filings to notify the Court were not necessary. (*Id.* at 53:17-21.)

As for all of the documents requested by Kurtz in the email message sent on August 19,

-33-

2008, Bach testified that any information that was available was provided to Kurtz. "I just want

to make [it] clear it's not like we had it and didn't give it to you," Bach testified on cross

examination. "It's the fact that, according to what my clients tell me, it didn't exist[;] ... they

didn't have a copy of [it]." (*Id.* at 79:20-24; 80:2-20.)

Based on Bach's testimony and a lack of evidence to the contrary, the Court concludes

that Bach did not intentionally abuse the judicial process or unreasonably prolong the litigation in

an effort to hinder or frustrate the collection of Mendez's judgment. Thus, attorneys' fees and

costs will not be assessed against Bach under section 105(a).

### C. Disgorgement of Fees

Finally, Mendez asks the Court to disgorge any attorneys' fees that Bach and Johnson

accepted throughout the course of the bankruptcy proceedings–Bach for filing the bankruptcy

petition and Johnson for filing an appeal of the Court's order permitting Rule 2004 subpoenas to

be issued against Broadway Bank and Chase Bank–both allegedly for the improper purpose of

delaying Mendez from collecting on her judgment.[14]

Bankruptcy courts have broad and inherent authority to deny compensation when

attorneys fail to comply with Code provisions governing the employment of professional persons,

---

[14] It is unclear how much Bach and Johnson received in legal fees throughout the course of
the proceedings. The Debtors' petitions indicate that Bach agreed to accept a total of $20,000 for
each case. (*See* Bankr. Case No. 08-17148, Dkt. No. 1 at 6; Bankr. Case No. 08-17149, Dkt. No.
1 at 6.) According to the Debtors' statement of financial affairs, Bach initially received $5,000
per case for legal services rendered. (*See* Bankr. Case No. 08-17148, Dkt. No. 18 at 3; Bankr.
Case No. 08-17149, Dkt. No. 32 at 3; *see also* Bankr. Case No. 08-17148, Dkt. No. 377 at 89-
90.) Although he received additional monies in connection with his representation of the
Debtors, he was unable to recall how much. (*See id.* at 90.) Other than a single check written to
Johnson for $3,000 (*see* Bankr. Case No. 08-17148, Dkt. No. 336 at 174:2-8), there is no evidence
in the record as to how much she was paid for her services.

debtor's transactions with attorneys, compensation of officers, and interim compensation. *In re*

*Redding*, 251 B.R. 547, 552 (Bankr. W.D. Mo. 2000), *aff'd*, 263 B.R. 547 (B.A.P. 8th Cir. 2001),

*amended on reh'g in part*, 265 B.R. 601 (B.A.P. 8th Cir. 2001). Specifically, courts derive the

authority to disgorge fees pursuant to 11 U.S.C. §§ 327, 329, 330, and 331, as well as Federal

Rules of Bankruptcy Procedure 2014(a), 2016, and 9011.

Conduct sanctionable by the disgorgement of fees includes failure to make accurate or

timely disclosure regarding payments received, *In re Kowalski*, 402 B.R. 843, 848-49 (Bankr.

N.D. Ill. 2009); *In re Prod. Assocs., Ltd.*, 264 B.R. 180, 189 (Bankr. N.D. Ill. 2001), failure to

disclose possible conflicts of interest, *see In re Firstmark Corp.*, 132 F.3d 1179, 1181 (7th Cir.

1997), excessive payments received by attorneys, *In re Geraci*, 138 F.3d 314, 320 (7th Cir.

1998); *In re Chellino*, 209 B.R. 106, 124 (Bankr. C.D. Ill. 1996), *aff'd*, *Geraci v. Hopper*, 208

B.R. 907 (C.D. Ill. 1997); *Geraci*, 138 F.3d 314, and misrepresentation of key facts to the court

and to interested parties, *In re Julian Servs. Indus., Inc.*, 220 B.R. 613, 618 (Bankr. N.D. Ill.

1998).

While courts are given "wide latitude in fashioning an appropriate sanction for unethical

behavior," *In re Soulisak*, 227 B.R. 77, 82 (Bankr. E.D. Va. 1998), disgorgement of fees is an

extreme, harsh remedy that is typically "confined to extraordinary situations," *In re Quaker*

*Distribs., Inc.*, 189 B.R. 63, 67 n.1 (Bankr. E.D. Pa. 1995), *order aff'd in part*, 207 B.R. 82 (E.D.

Pa. 1997) (internal quotation omitted); *see also Specker Motor Sales Co. v. Eisen*, 300 B.R. 687,

691 (W.D. Mich. 2003). Thus, the imposition of disgorgement as a sanction is left to the court's

sound discretion. *In re Gage*, 394 B.R. 184, 191 (Bankr. N.D. Ill. 2008); *but see Redding*, 251

B.R. at 552 (noting that disgorgement of fees received is the "expected and proper remedy to be

applied" when a debtor's attorney fails to comply with bankruptcy statutes and rules).

The Court finds disgorgement of Bach's fees to be unduly harsh in light of the work that he performed throughout the pendency of the proceedings. According to the testimony, Bach participated in discussions to settle Mendez's claim, he prepared a plan of reorganization and disclosure statement, he worked to further refine the plan, and he provided a variety of other legal services to the Debtors. (*See, e.g.*, Bankr. Case No. 08-17148, Dkt. No. 377 at 16-35.) Based on the Court's findings that Bach neither filed the bankruptcy petitions for an improper purpose, intentionally abused the judicial process, nor unreasonably prolonged the litigation in an effort to hinder or frustrate the collection of Mendez's judgment, the Court will not disgorge fees that Bach has already received.

As for Johnson, Mendez requests the disgorgement of her fees based on Johnson's filing of the appeal of the Court's order of September 13, 2009 allowing Kurtz to conduct Rule 2004 examinations of Broadway Bank and Chase Bank and issue subpoenas and obtain records pertaining to the Debtors' financial affairs. The record is devoid of any evidence to indicate that Johnson filed that appeal for the improper purpose of delaying Mendez from collecting on her judgment. Accordingly, the Court will not impose sanctions against Johnson by disgorging the fees that she received throughout the bankruptcy proceedings.[15]

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the Chapter 11 petitions of debtors Dental

---

[15] The district court judge denied Mendez's request for fees and costs with respect to the appeal because it was not supported by legal argument or legal precedent. *Dental Profile,* 2010 WL 431590, at *4 n.3.

Profile, Inc. and Dentist, P.C. were filed for the improper purpose of delaying creditor Nereida

Mendez from collecting on her judgment.  Accordingly, the Court exercises its discretion by

imposing sanctions under Federal Rule of Bankruptcy Procedure 9011 jointly against Dental

Profile, Inc., Dentist, P.C., and Husam Aldairi in the amount of $314,536.34.

   This opinion will serve as findings of fact and conclusions of law.  A separate judgment

order will be entered.


Dated:   3/31/11                        ENTERED:

                                            _J.P.Cox_____        *Jacqueline P. Cox*

                                        Jacqueline P.  Cox
                                        United States Bankruptcy Judge